UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KATHERINE KELLER, as the surviving child
of decedent Treva Stuck, and the ESTATE OF
TREVA STUCK, through Katherine Keller as
Administrator of the Estate,

           Plaintiffs,

vs.

DIVERSICARE OF COUNCIL GROVE, LLC
and DIVERSICARE HEALTHCARE
SERVICES, LLC,

           Defendants.

Case No. 23-2556-ADM

**MEMORANDUM AND ORDER**

This lawsuit arises from the fall and subsequent death of Treva Stuck while residing at a nursing home in Council Grove, Kansas. Ms. Stuck's daughter Katherine Keller (as Ms. Stuck's heir at law) and Ms. Stuck's Estate (through Keller as administrator) (together, "plaintiffs") assert Kansas-law claims for wrongful death, negligence, and joint venture against Diversicare of Council Grove, LLC and Diversicare Healthcare Services, LLC (together, "defendants"). The case is before the court on plaintiffs' motion for partial summary judgment. (ECF 70.) By way of the motion, plaintiffs seek a determination that defendants were engaged in a joint venture (such that they are vicariously liable for each other's actions) and that certain other facts are undisputed. For the reasons explained more fully below, this motion is denied.

**I.    BACKGROUND**

For purposes of this motion, the facts set out below are either uncontroverted, stipulated, or set forth in the light most favorable to defendants as the nonmoving party. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014) ("In articulating the factual context of the case . . . [t]he evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) ("[W]e view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant.").[1]

In November 2021, Ms. Stuck was 83 years old and living at home with her husband, George Stuck. On November 9, she fell from her bed and fractured her hip. She entered the hospital and had hip surgery. From there, she was admitted to Diversicare of Council Grove, LLC ("Diversicare Council Grove"), a skilled nursing facility. She entered Diversicare Council Grove on November 23 for inpatient care and physical rehabilitation. At approximately 11:00 p.m. on December 31, Ms. Stuck fell from her bed at Diversicare Council Grove. She sustained injuries that ultimately led to her death on January 11, 2022.

During Ms. Stuck's stay at Diversicare Council Grove, an agreement was in effect between Diversicare Council Grove and Diversicare Health Services, LLC ("Diversicare Services"). The parties refer to this as "the Management Agreement." As relevant to the issues in this case, the Management Agreement contains the following provisions:

> 3. <u>Duties of Manager</u> . . . [Diversicare Council Grove] hereby delegates to [Diversicare Services] the day to day responsibility of the management of the Facility and its operations in all respects and [Diversicare Services] hereby assumes, and agrees to use its best efforts to exercise such control and responsibility with a view towards professional management of the Facility in accordance with

---

[1] In setting forth these facts, the court has considered plaintiffs' highly generalized argument that all but seven of defendants' responses to plaintiffs' statements of undisputed facts fail to actually controvert plaintiffs' statement. (*See* ECF 80, at 8.) Where the court has declined to include an allegedly undisputed fact, the court has found that reasonable inferences drawn from the cited factual record could lead a rational trier of fact to find for defendants. In addition, when a party characterizes a document as requiring or entitling a party to do certain things and the opposing party disputes that characterization or asserts that it does not show the whole picture, the court has set forth the language of the document itself, rather than a party's paraphrased interpretation.

customary industry standards. Such responsibility and control will include . . .

(a) to have direct responsibility and authority for recruiting, negotiating with, hiring, training, supervising, promoting, assigning, setting the compensation level of (provided such amount is in compliance with applicable law), and discharging all operating and service personnel deemed by [Diversicare Services] to be necessary for the proper operation and maintenance of the facility. All such employees, except the Facility's Administrator (who shall be an employee of [Diversicare Services]), shall be employees of and shall be carried on the payroll of [Diversicare Council Grove] and shall not be employees of [Diversicare Services]; provided, however, that such employees shall be subject to the control of [Diversicare Services] on behalf of [Diversicare Council Grove]; . . .

. . . .

(e) to supervise the purchase of such inventories, food, beverages, provisions, supplies and equipment as may be required to properly maintain and operate the Facility and to contract for the purchase of same in the name of [Diversicare Council Grove] . . . .

. . . .

It is understood that, within the scope of the authority granted by this Agreement, [Diversicare Services] is acting as agent of [Diversicare Council Grove], and as such incurs no liability as principal with respect to any obligations undertaken by [Diversicare Services] hereunder other than in connection with its duty to act in such capacity. [Diversicare Services] will not have the obligation of preparing any tax returns or annual audits of the Facility. . . .

4. <u>Management Fees</u>. In consideration of, and as remuneration for, the services provided in this Agreement with respect to the Facility, [Diversicare Council Grove] agrees to pay to [Diversicare Services] a management fee equal to [a percentage] of monthly Net Operating Revenues for the Facility . . . .

5. <u>Covenants.</u> [Diversicare Council Grove] agrees with [Diversicare Services] as follows:

(a) [Diversicare Council Grove] will maintain at all times sufficient cash on hand or on deposit in a bank account in the name of [Diversicare Council Grove], with [Diversicare Services] as an authorized signatory, to meet all Operating Expenses and Management Fees of the Facility as such become due. [Diversicare Council Grove] will receive all interest earned on deposited cash. [Diversicare Council Grove] will give [Diversicare Services] prior written notice before writing checks on the bank account in which the deposited cash is held.

(b) [Diversicare Services] will be authorized, (i) to write checks and otherwise access the cash on deposit in the bank account

> referenced in subparagraph 5(a) to pay Operating Expenses and Management Fees with respect to the Facility, (ii) to incur expenses and liabilities in the ordinary course of the operations and management of the Facility, and (iii) to receive revenues from the operation of the Facility and deposit the same in the appropriate bank accounts. At [Diversicare Services'] election, [Diversicare Services] may open such bank accounts ("Manager's Accounts") for the Facility to receive and deposit all revenues of the Facility. The Manager's Accounts shall be under the sole and exclusive control of [Diversicare Services]. . . .
>
>    . . . .
>    10. <u>Books and Records</u>. All books, records and reports prepared by [Diversicare Services] for use of or in connection with the operation of the Facility will be the property of [Diversicare Council Grove], provided that [Diversicare Services] may make copies thereof for its own use as [Diversicare Services] may desire. . . .
>    . . . .
>    12. <u>Right to Inspect; Audit</u>. The parties hereto agree that at all reasonable times [Diversicare Services] will permit [Diversicare Council Grove] or its representatives to inspect the buildings, premises and records of the Facility and to perform such audits of [Diversicare Services]'s financial books and records relating to the Facility as [Diversicare Council Grove] may request to confirm the financial results reported by [Diversicare Services]. . . .
>    . . . .
>    14. GENERAL . . . (i) Nothing contained in this Agreement is intended or is to be construed to create any association, partnership or joint venture between [Diversicare Council Grove] and [Diversicare Services]. [Diversicare Services] is an independent contractor retained by [Diversicare Council Grove].

(ECF 70-1.) The Management Agreement further states that either party may terminate the agreement due to material default with 30 days' notice and time to cure the default or due to bankruptcy. And in the event of termination, Diversicare Services will tender a final accounting to Diversicare Council Grove and will surrender all contracts, records, files, and other information that may be pertinent to the facility's continuing operation.

At the time of Ms. Stuck's stay at Diversicare Council Grove, Brad Fischer was the facility Administrator. He was responsible for completing the annual facility assessment required by federal regulations. Betty Cox was the facility's Director of Nursing Cox. She was responsible

4

for setting the facility's daily staffing.  Fisher, Cox, and the nurses and nurse aids who cared for Ms. Stuck were employees of Diversicare Council Grove.

Diversicare Council Grove was one of 50 skilled nursing facilities that Diversicare Services supported.  Diversicare Services operated a centralized service center in Brentwood, Tennessee ("the Brentwood Support Center").  The Brentwood Support Center assisted Diversicare Council Grove with payroll processing and billing for services provided to residents.  Diversicare Services also managed an intranet, called "My Diversicare," from which Diversicare Council Grove employees could access their paychecks, applications, policies and procedures, and interactive training.  Employees at the Brentwood Support Center developed and revised uniform policies and procedures that Diversicare Services gave to facility administrators and directors of nursing to implement, enforce, and establish.  The implementation of the policies and procedures might vary by facility.

Diversicare Services produced an employee handbook called "Team Member Handbook." The opening sentence of the Team Member Handbook states: "Congratulations on joining our Diversicare team member family."  (ECF 70-2, at 3.)  It then goes on to state, "we have been entrusted to care for over 5,000 patients and residents each day."  (*Id.*)  The Introduction section of the Team Member Handbook states: "This Team Member Handbook ('Handbook') contains information about Diversicare (collectively including our affiliates and subsidiaries)."  (*Id.* at 5.) It notes that "[s]pecific policies and procedures are located on the company website, http://MyDiversicare, which is accessible to all team members without a password."  (*Id.*)

Diversicare Services employed Kevin Crowley as Regional Vice President for the Midwest Region and assigned him to assist Diversicare Council Grove.  Crowley's job duties included "overall operations" for his region and providing extra support to facility administrators.  (ECF

5

70-3, at 5.) Although administrators had "the ability to run" their facilities, Crowley helped them navigate operational issues and obtain guidance on such things as policies. *Id.* Diversicare Council Grove's Administrator, Fischer, reported to Crowley. Crowley, Fischer, and Cox worked together to develop Diversicare Council Grove's annual budget, which included an allocated number of nursing staff based on a budgeted number of hours per patient per day ("HPPD"). Crowley was responsible for approving the budget. Fisher and Cox determined how to use the allocated staff based on the needs of Diversicare Council Grove's residents. Diversicare Services also employed a Director of Clinical Operations, Stephanie Turner, who supported Cox by providing guidance about medical care, including advice regarding falls. Diversicare Services' employees had access to certain medical records, called "PointClickCare records," of Diversicare Council Grove residents.

Plaintiffs bring three claims in this lawsuit: (1) Keller (as Ms. Stuck's heir at law) brings a wrongful death claim against both defendants; (2) Ms. Stuck's estate brings a negligence claim against both defendants; and (3) both plaintiffs assert the defendants are engaged in a joint venture, such that one is vicariously liable for the other's actions. Plaintiffs now seek a summary determination of the joint-venture claim, as well as a determination that certain facts material to the wrongful-death and negligence claims are "not genuinely in dispute" and are treated as established in the case. *See* FED. R. CIV. P. 56(a), (g).

## II.    SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law. *Celotex*

6

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Adler*, 144 F.3d at 670–71. Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party may not simply rest upon its pleadings, *id.* at 256, or create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671-72. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

The court views the facts "in the light most favorable to the non-moving party" and draws all reasonable inferences in its favor. *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (quoting *Adler*, 144 F.3d at 670). A dispute of material fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (quoting *Adler*, 144 F.3d at 670).

"Significantly for the instant case, where the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone*, 810 F.3d at 1153 (internal citations and modifications omitted). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154 (quoting 11 MOORE'S FED. PRACTICE § 56.40[1][c] (Matthew Bender 3d ed. 2015)).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedural vehicle "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting FED. R. CIV. P. 1). That said, "a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences." *Sunfresh, Inc. v. Bean Acres, Inc.*, 180 F. Supp. 2d 1224, 1226–27 (D. Kan. 2001). With these standards in mind, the court addresses plaintiffs' motion.

### III.  ANALYSIS

#### A. Plaintiffs Have Not Demonstrated That Undisputed Material Facts Entitle Them to Summary Judgment on their Joint-Venture Claim

Plaintiffs' motion first asks the court to find that defendants were in a joint venture with respect to the nursing facility where Ms. Stuck fell from her bed and sustained the injuries that led to her death. Because plaintiffs bear the burden of proof on this claim, they must show, as stated above, that "no reasonable trier of fact could find other than for [plaintiffs]" by demonstrating that the evidence in their favor is "so powerful that no reasonable jury would be free to disbelieve it." *Leone*, 810 F.3d at 1153-54. Although the question of whether a joint venture exists presents a close call, the court ultimately finds that disputes of material fact prevent a holding that no reasonable juror could answer the question in the negative.

Under Kansas law, a joint venture is "an association of two or more persons or corporations to carry out a single enterprise for profit." *George v. Capital South Mortgage Invs., Inc.*, 961 P.2d 32, 44 (Kan. 1998); *see also Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 596 P.2d 816, 823 (Kan. 1979). A joint venture may only exist by agreement of the parties, and where its existence is controverted, can be found through the parties' mutual acts and conduct. *See Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp. 3d 1334, 1340 (D. Kan. 2016);

*Paradigm All., Inc. v. Celeritas Techs., LLC*, 659 F. Supp. 2d 1167, 1178 (D. Kan. 2009) (citing *George*, 961 P.2d at 44, and *Pulsecard Inc. v. Discover Card Servs., Inc.*, 917 F. Supp. 1478, 1485 (D. Kan. 1996)).  The existence of a joint venture "is a question of fact decided from the facts and circumstances of each case." *Cargill*, 168 F. Supp. 3d at 1340.  "Among the acts or conduct which are indicative of a joint venture, but no single one of which is controlling in the determination, are: (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement." *Mod. Air Conditioning,* 596 P.2d at 823; *see also Paradigm*, 659 F. Supp. 2d at 1178 (setting out the factors); *Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1158 (10th Cir. 1994) (same).  "The party asserting the joint venture has the burden of proving its existence." *Paradigm*, 659 F. Supp. 2d at 1178.

    Plaintiffs correctly note that defendants cannot preclude the existence of a joint venture "simply by disclaiming it in writing." *Cargill*, 168 F. Supp. 3d at 1340.  Thus, the disclaimer in Paragraph 14(i) of the Management Agreement of the parties' intent *not* to create a joint venture "does not bar the existence of a joint venture as a matter of law." *Id.*  Rather, the court considers the entire agreement, as well as the "mutual acts and conduct of the parties." *Id.*  The court proceeds to do so now by considering the identified indices of joint ventures.

### 1. Joint Ownership and Control of Property

    Plaintiffs contend that, pursuant to the Management Agreement, Diversicare Services asserted control over the Diversicare Council Grove facility in a number of respects.  First, the Management Agreement gave Diversicare Services "direct responsibility and authority for

recruiting, negotiating with, hiring, training, supervising, promoting, assigning, [and] setting the compensation level" of all Diversicare Council Grove employees. (ECF 70-1 ¶ 3(a).) Second, the Management Agreement gave Diversicare Services the ability to access and write checks from a bank account that Diversicare Council Grove maintained to cover operating expenses and management fees. (*Id.* ¶ 5(a)-(b).) Diversicare Services was authorized to incur necessary expenses and liabilities for normal facility operations, and to collect and deposit facility revenue. Third, the Management Agreement gave Diversicare Services the option to open bank accounts in its own name and under its exclusive control to receive and facility's deposit revenues. (*Id.* ¶ 5(b).) Finally, Diversicare Services agreed to permit Diversicare Council Grove to inspect the facility buildings, premises, and records at all reasonable times. (*Id.* ¶ 12.)

On the other side of the coin, defendants point to provisions in the Management Agreement that support a finding that defendants did not assert joint ownership and/or control over Diversicare Council Grove property. First, as noted above, the Management Agreement explicitly states that nothing therein "is intended or is to be construed to create any association, partnership or joint venture" between defendants, and that Diversicare Services "is an independent contractor retained by" Diversicare Council Grove. (ECF 70-1 ¶ 14(i).) While this statement is not dispositive of the issue, other provisions of the Management Agreement support this arrangement. With respect to property ownership, the Management Agreement makes Diversicare Council Grove the owner of "[a]ll books, records and reports prepared by [Diversicare Services] for use of or in connection with the operation of the Facility." (*Id.* ¶ 10.) Defendants also assert that the provision of the Management Agreement in which Diversicare Services agreed to permit Diversicare Council Grove to inspect the facility buildings, premises, and records at all reasonable times (*id.* ¶ 12) indicates that Diversicare Council Grove owns such property and emphasizes Diversicare

10

Services' lack of control over the property. The Management Agreement further states that in the event either party terminates the Management Agreement, Diversicare Services will tender a final accounting to Diversicare Council Grove and will surrender all contracts, records, files, and other information that may be pertinent to the Facility's continuing operation.

Third, defendants suggest that the Management Agreement includes provisions delegating certain roles and responsibilities to Diversicare Services "to allow Diversicare [] Services the ability to engage in their duties as the agent of Diversicare [] Council Grove." (ECF 75, at 26.) Through the Management Agreement, Diversicare Council Grove delegated to Diversicare Services "the day to day responsibility of the management of the Facility and its operations in all respects." (ECF 70-1 ¶ 3.) The Management Agreement states, "[i]t is understood that, within the scope of the authority granted by this Agreement, [Diversicare Services] is acting as agent of [Diversicare Council Grove], and as such incurs no liability as principal with respect to any obligations undertaken by [Diversicare Services] hereunder other than in connection with its duty to act in such capacity." (*Id.*) The Management Agreement further provides that "[Diversicare Services] will not have the obligation of preparing any tax returns or annual audits of the Facility." (*Id.*) Finally, defendants characterize the provisions of the Management Agreement that give Diversicare Services financial rights as simply necessary to effectuate Diversicare Services' role as the manager of the facility and "do not show joint ownership and control of the property." (ECF 75, at 26.)

"Ownership does not necessarily mean absolute dominion over the subject property . . . the owner can be enmeshed in the direction and control of the business without being involved in the actual management." *State ex rel. Six v. Kan. Lottery*, 186 P.3d 183, 190 (Kan. 2008) (internal quotations and citation omitted). The court finds that the evidence could be read to support either

side's contentions about property ownership and control. Of course, on summary judgment the court cannot weigh the evidence or choose between competing inferences. *See Sunfresh*, 180 F. Supp. 2d at 1226–27. Thus, the court is unable to conclude that this factor weighs in favor of either party.

### 2. Sharing of Expenses, Profits, and Loses

Under the second consideration, the court considers whether Diversicare Council Grove and Diversicare Services had a common pecuniary interest. Plaintiffs first assert that they did because Diversicare Services was entitled to share in Diversicare Council Grove's profits. Plaintiffs point to language in Paragraph 4 of the Management Agreement, which states that, as remuneration of the management services Diversicare Services provided with respect to the facility, Diversicare Council Grove "agrees to pay to [Diversicare Services] a management fee equal to [a percentage] of monthly Net Operating Revenues for the Facility." (ECF 70-1 ¶ 4.)

But defendants disagree that the reference to "Net Operating Revenues" refers to "profits." Defendants note that the Management Agreement defines "Net Operating Revenues" as "the revenue of the Facility from all sources during the term of this Agreement, including ancillary revenues, less adjustments necessary to reduce the stated revenue to the net contractual amount to be collected." (ECF 70-1 ¶ 1(b).) Thus, according to defendants, Diversicare Services is compensated by a percentage of the payment Diversicare Council Grove received for services that Diversicare Council Grove provided, prior to any deduction for operating expenses (i.e., prior to a calculation of profit). Plaintiffs argue that defendants are mis-comprehending the definition of "Net Operating Revenue," which should refer to the money Diversicare Council Grove made after subtracting operating expenses (i.e., to profits). Neither party has presented evidence indicating how the defendants *actually behaved* in carrying out Paragraph 4. In other words, the summary-

12

judgment record does not establish whether Diversicare Council Grove calculated the management fee paid to Diversicare Services before or after considering expenses. Thus, whether defendants shared "profits" is a question of fact. Nonetheless, it is undisputed that under either calculation, defendants shared a common interest in the pecuniary success of Diversicare Council Grove. This is a factor that weighs in favor of finding a joint venture.

Second, the Management Agreement provides that Diversicare Council Grove "will receive all interest earned on deposited cash" in the bank account Paragraph 5(a) requires it maintain. (ECF 70-1 ¶ 5(a).) This provision, allocating interest earned to Diversicare Council Grove only, weighs against finding a joint share of profits.

Finally, plaintiff has not presented much evidence demonstrating that Diversicare Services and Diversicare Council Grove shared expenses or losses. Plaintiffs assert that Diversicare Services is "responsible for" providing an influx of cash to Diversicare Council Grove should Diversicare Counsel Grove need it, but this assertion goes further than the Diversicare Services testimony on which it relies. Crowley testified on behalf of Diversicare Services that if a facility like Diversicare Council Grove needs an influx of cash, Crowley is "not aware of how the transactions happen" but that Diversicare Services "one way or the other is going to ensure [that] happens." (ECF 70-3, at 10.) Crowley did not testify that Diversicare Services was required to provide (or was responsible for providing) an influx of cash, only that it would ensure that the facility got such cash somehow. Although such involvement is certainly a consideration that weighs in favor of finding a joint venture, it is not as weighty a consideration as it would be if Diversicare Services was *required* to so do.

Plaintiffs also note that the Management Agreement gives Diversicare Services authority to "incur expenses and liabilities in the ordinary course of the operations and management of the

13

Facility," but that authority is in connection with Diversicare Services' authority to access the bank account maintained by Diversicare Council Grove "to meet all Operating Expenses and Management Fees." (ECF 70-1 ⁋ 5(a), (b).) So it is not indicative of whether or not defendants shared expenses or losses. A reasonable reading of this evidence could be that the expenses were Diversicare Council Grove's alone to bear.

Overall, the undisputed facts do not clearly indicate that this factor favors either party.

### 3. Control Over and Active Participation in the Management and Direction of the Business Enterprise

The parties also dispute the extent to which Diversicare Services asserted control over and actively participated in the management and direction of Diversicare Council Grove. The evidence could be viewed to support a number of conclusions.

First, the Management Agreement gave Diversicare Services responsibility for hiring, training, and supervising personnel necessary to operate and maintain the facility. Diversicare Services created an employee handbook with policies, which was distributed to Diversicare Council Grove employees. The policies were also accessible on a website that Diversicare Services maintained for the many facilities it managed ("MyDiversicare"). Plaintiffs note that the employee handbook used "Diversicare" in the singular by referring to it as a "Company," but defendants counter that the introduction defines "Diversicare" as "collectively including our affiliates and subsidiaries." (ECF 70-2, at 5.) And it is undisputed that the implementation of the various employee policies may differ in the facilities that Diversicare Services manages. Moreover, the Management Agreement directed that Diversicare Services' control over facility employees was "on behalf of" Diversicare Council Grove. (ECF 70-1 ⁋ 3(a).)

Second, plaintiffs note that the Diversicare Council Grove annual budget, which set the number of nursing staff at the facility, required the approval of Crowley as an employee of

14

Diversicare Services. Although this fact is undisputed, it does not show the whole picture of how the facility budget is determined. It is also undisputed that Crowley, Fischer, and Cox worked together to develop the budget, and that Fisher and Cox determined how to use the allocated staff based on the needs of Diversicare Council Grove's residents. Thus, reasonable fact finders could reach different conclusions as to whether the budgeting process suggests defendants operated the facility as a joint enterprise.

Third, the day-to-day management of the facility likewise presents a mixed bag. Fisher, the facility administrator, was employed by Diversicare Council Grove, but he reported to Crowley, a regional vice president of Diversicare Services. Fisher "ran" the facility, but Crowley provided support in navigating operational issues. Cox, a Diversicare Council Grove employee, was responsible for setting the facility's daily staffing schedule. But Diversicare Services employee Turner supported Cox by providing guidance about medical care. Fisher was responsible for completing an annual facility assessment required by federal regulations.

Fourth, plaintiffs ask the court to recognize that Diversicare Services "exerted financial control over [Diversicare Council Grove] by requiring that it provide the Facility permission of capital expenditure more than $500" (ECF 70), but this fact is in dispute. Although Crowley so testified in the Diversicare Services Rule 30(b)(6) deposition (ECF 70-3, at 6), Fischer testified that he could make purchases above $500 without prior authorization from Diversicare Services and has done so in the past (ECF 70-4, at 8). Fisher testified that the capital expenditure form for dollar amounts more than $500 was "typically for accounting purposes only." (*Id.*) He also testified that, "general supplies, for example, we process orders for nursing supplies that may be anywhere from a thousand to $2,500 a week, and there's no approval other than myself." (*Id.*)

Finally, defendants again argue that the management and control that Diversicare Services asserted was simply part of Diversicare Services' role as an agent of Diversicare Council Grove pursuant to the Management Agreement, rather than a reflection of who ultimately had the final say over the management and direction of Diversicare Council Grove. Defendants note that the Management Agreement gave Diversicare Council Grove the right to terminate the agreement in the event of breach.

The court finds that the undisputed facts could lead reasonable fact finders to disagree about whether this factor weighs in plaintiffs' or defendants' favor.

### 4. Parties' Intent

The next consideration is whether the parties expressed or implied an intent to carry out a single enterprise for profit. Defendants assert that the parties expressly stated their intention *not* to form a joint venture in Paragraph 14(i) of the Management Agreement: "Nothing contained in this Agreement is intended or is to be construed to create any association, partnership or joint venture" between defendants. (ECF 70-1 ¶ 14(i).) But as noted above, this provision is not dispositive of the parties' intent. *See Cargill,* 168 F. Supp. 3d at 1340-41. So the finder of fact must consider all the facts and circumstances in the case to determine intent. *Id.* at 1340.

Plaintiffs assert that defendants' actions and agreements discussed above, as well as the fact that Diversicare Services' Brentwood Support Center was responsible for administering Diversicare Council Grove's payroll, billing, and email servers, "are indicative of an intent to form a joint enterprise." (ECF 70, at 29.) Defendants assert that their actions and agreements discussed above, as well as the fact that they do not share the same location, indicate that they had no intention to create a joint enterprise. Defendants further assert that, instead, they are in a principal-agent relationship, with Diversicare Services serving as Diversicare Council Grove's agent.

16

Defendants argue that through multiple provisions of the Management Agreement, Diversicare Council Grove has delegated to Diversicare Services duties to perform on behalf of Diversicare Council Grove. Plaintiffs deem this a "judicial admission" that a principal-agent relationship exists between defendants, and plaintiffs assert that "agency is a necessary component of joint ventures." (ECF 80, at 11.) Assuming plaintiffs' contentions are correct, they are inconsequential. Simply because agency is a necessary component of a joint venture does not mean that all principal-agency relationships constitute a joint venture. Plaintiffs cite no support for such a novel conclusion.

Again, this factor is open to reasonable interpretation under the undisputed facts.

### 5. Conclusion

After reviewing the parties' arguments and the exhibits provided in support of the facts asserted by each, and considering the non-controlling factors that are indicative of a joint venture, the court is unable to conclude that the undisputed facts could lead a reasonable juror *only* to find for plaintiffs on their joint-venture claim. Both parties dispute sufficient facts relating to the factors. The undisputed material facts, viewed in the light most favorable to defendants, do not clearly tip the scale in favor of finding a joint venture. As noted above, plaintiffs are only entitled to summary judgment on their joint-venture claim if they demonstrate that, in light of the undisputed facts, no reasonable trier of fact could find anything other than that a joint venture exists. *See Leone*, 810 F.3d at 1153. Plaintiffs have not met that burden. Thus, the fact question of whether a joint venture existed between Diversicare Council Grove and Diversicare Services is one for the jury to decide. Accordingly, the court denies summary judgment with respect to plaintiffs' joint-venture claim (Count III).

### B. The Court Declines to Determine a Summary Disposition of Facts

The second portion of plaintiffs' motion asks the court to determine that certain facts material to plaintiffs' other two claims—the wrongful-death and negligence claims—are "not genuinely in dispute" and treated as established in the case. (ECF 70, at 29-40.) The court declines this request.

Federal Rule of Civil Procedure 56(g) provides that "[i]f the court does not grant all the relief requested by the motion [for summary judgment], it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Whether to undertake a Rule 56(g) analysis lies in the court's sound discretion. *See Watchous Enters., LLC v. Mournes*, 87 F.4th 1170, 1178 (10th Cir. 2023) (reviewing Rule 56(g) decision for abuse of discretion); *In re Holguin,* 609 B.R. 878, 881 (Bankr. D.N.M. 2019) ("Whether to grant a request to establish facts falls within the Court's sound discretion."); 10B CHARLES ALAN WRIGHT ET AL., FED. PRAC. & PROC. CIV. § 2737 (4th ed.) ("The question whether to exercise [its] authority [to establish undisputed material facts under Rule 56(g)] is within the court's discretion."). The Advisory Committee notes to Rule 56(g) direct:

> [A court] may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.

FED. R. CIV. P. 56 advisory committee's note to 2010 amendment.

Here, the court declines to determine whether certain facts not material to resolution of plaintiffs' summary judgment motion on the joint-venture claim should be deemed established. The primary purpose of Rule 56(g) is "to salvage some constructive result from the judicial effort

18

expended in denying a proper summary judgment motion." *Roberts v. Chesapeake Operating, Inc.*, 426 F. Supp. 2d 1203, 1210 (D. Kan. 2006) (discussing Rule 56(g)'s predecessor, Rule 56(d)); 10B WRIGHT AND MILLER, FED. PRAC. & PROC. CIV. § 2737 ("As has been noted by several courts, the primary purpose of the rule is to salvage some results from the effort involved in the denial of a motion for summary judgment."). But because the fact statements on which plaintiffs seek a Rule 56(g) ruling (*i.e.,* those falling after plaintiffs' factual statement numbered 41) are not material to the court's summary-judgment determination of plaintiffs' joint-venture claim, the court has not expended effort to determine whether they are "not genuinely in dispute." *Cf. In re Lane*, No. 19-11901-J13, 2021 WL 3438347, at *11 (Bankr. D.N.M. Aug. 5, 2021) (granting request to determine facts established only "to the extent it relates to undisputed facts necessary to resolution of Plaintiff's Summary Judgment Motion"). Defendants assert these facts are controverted (ECF 75, at 13-18), and the court thus would be required to expend time and resources to determine whether there is a genuine dispute as to each. The court concludes "that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event." FED. R. CIV. P. 56 advisory committee's note to 2010 amendment. The court therefore denies this portion of plaintiffs' motion on this basis.[2]

---

[2] Plaintiffs' reply brief expands their Rule 56(g) request to additional fact statements that the court considered in ruling the request for summary judgment on the joint-venture claim. (ECF 80, at 14.) Generally, the court does not consider issues raised for the first time in a reply brief. *See United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019); *Eucalyptus Real Est., LLC v. Innovative Work Comp Sols., LLC*, 642 F. Supp. 3d 1273, 1281 (D. Kan. 2022). But even if the court were to consider these additional fact statements, the court's decision would not change because "there remain significant factual disputes pertaining to the [joint-venture] claim[]." *CMI Roadbuilding, Inc. v. Specsys, Inc.*, No. CIV-18-1245-G, 2021 WL 2189222, at *14 (W.D. Okla. May 28, 2021) (declining to exercise its discretion to identify material facts not in dispute).

**IT IS THEREFORE ORDERED** that plaintiffs' motion for partial summary judgment (ECF 70) is denied.

Dated March 11, 2025, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge
